We have six cases on our agenda today, but only five sit for oral argument. We'll take a brief recess at some time, probably after the third or fourth case. We'll start with Springer v. Grisham, 23-2192. I meant to say that I hope all the attorneys are getting double pay for coming to Denver in this weather. We get paid double, as you might expect. Good morning, and may it please the Court. Janet Carter, and I represent defendants. I'd like to reserve five minutes for rebuttal. This case should be dismissed for lack of jurisdiction, but if the Court disagrees and reaches the merits, it should hold that Mr. Springer is not likely to succeed on his Second Amendment challenges. On jurisdiction, this case is just like We the Patriots, and the decision there establishes that Mr. Springer lacks standing. It applied longstanding and familiar principles of redressability to hold that any injury from the public health order is not redressable when a separate, unchallenged law prohibits the proposed conduct. It also confirmed that it's the plaintiff's burden to identify specifically the parks or playgrounds where he wants to carry. Here, Mr. Springer has not identified any specific park or playground. Even if this Court were to draw a very generous inference from his declaration, the only park he conceivably might refer to is one expressly covered by Albuquerque's administrative instruction. Therefore, under We the Patriots, this Court cannot provide any effective relief, and he lacked standing. Now, in his supplemental brief, plaintiff's only argument for distinguishing We the Patriots was that he claimed he had evidence that the separate, overlapping laws were not being enforced. But then the only evidence that he came forward with to try to prove up that claim was completely irrelevant. All he pointed to were two news articles in which the county sheriff said that he wouldn't enforce the public health order, the law that Mr. Springer is challenging in this case. Neither article said anything about enforcement of the separate, overlapping laws. Can you explain why? Did he say why he wasn't going to enforce it? He's, well, the first statement that he made was before Judge Urias ruled in the district court. So I think at that point he thought that there was uncertainty around it. And his second- Well, go ahead. Oh. The second reason was- Well, the second statement that the news organization reported came after Judge Urias' opinion, and I think he said something like, we're focused on other issues. But, of course, I think the most important point is that the state police were enforcing the public health order. So there was already an authority that was responsible for enforcing it. So the fact that he said, my office is focused on other things, I think, is very different from suggesting that when he's the only authority responsible for enforcement, as is the case with respect to the Benalio County ordinances. Maybe I'm getting the articles confused, but I thought he said that he didn't think we should enforce these against law-abiding citizens. Did he say that? Well, he said that he did criticize the- expressed some criticism about the public health order. But, again, he didn't say anything about the Benalio County ordinance. No, no, but if the reason he wasn't going to enforce the state order was because he didn't think he should be enforcing that type of law against law-abiding citizens, then that would- that reasoning would apply to the county ordinances also, would it not? I think if it was a constitutional concern, then Judge Urias' decision, as well as the wide range of decisions across the country now that have upheld prohibitions in parks and playgrounds, would have allayed that concern. And, again, I think a big piece of that was a concern about it not being necessary for him to do so when there was already an authority responsible for enforcing it. But another piece of this is that Mr. Springer has never suggested and never named any park or playground in Benalio County where he wanted to carry a firearm. Under the clear terms of We the Patriots, that was his obligation, and particularly if he wanted to take advantage of this suggestion, which I submit is purely speculative, that there's some inference that can be drawn from the position about the public health order to the position about the separate Benalio County ordinance. In order to take advantage of that, he would have to have established that he wanted to carry in a Benalio County park. He didn't do that. Counsel, the redressability question is informed, of course, by this, what looks to me to be sort of a layer of other ordinances that prohibit the same conduct. But my understanding from the briefing and the record is that there's a lot of litigation over maybe some of these lower ordinances as well. Has that status of that litigation changed at all in any way that informs the case that's before us? The status has not changed. So there's a challenge in New Mexico State Court, the Supreme Court, to the governor's authority to declare the emergency in the first place. That was briefed. I think it was I think it was argued in the beginning of last year or perhaps even earlier. And no decision has has issued. And then there's a challenge to the Albuquerque administrative instruction and its clarification of how state law applies in the city of Albuquerque. And that case has been stayed pending the resolution of these cases. So no development in either one of those decisions. Counsel, could you help me understand? Are you're are you making two alternate arguments? I mean, could you prevail under either one that you're making? Either that no specific park named and overlapping was. Would either of those work in your view? Or is one preferable to the other? So we are the argument that they're connected is the answer. The reason that this court said in We the Patriots that a plaintiff has to identify a specific park where they want to carry. Excuse me. Well, that was part of its read readability analysis. So the reason that it said that was in order to determine whether there was an overlapping ordinance applicable in the places. And because if there are overlapping ordinances, then read readability fails and the plaintiff has not established standing. I'm not here arguing that the failure to identify a specific park defeats injury. In fact, although I think the court could also reach that conclusion. But again, I think my argument is based in We the Patriots. And I believe that what the court was when the court said in that case very specifically, we think that is it is plaintiff's burden to identify a specific playground that they plan to visit. When the court said that it was part of its read readability analysis. Does that answer your question? Well, I guess so. I mean, you said you're not here to argue that the lack of specificity dooms the case. Why are you not arguing that? Sorry, I do think it dooms the case. But I think it dooms it under the read readability prong of standing rather than under the injury in fact prong of standing. OK, thank you. I'm happy to continue answering questions, but I'm also happy to sit down and answer any further questions on. I read your brief to say that if we were to agree with you that Mr. Springer lacks standing, that that defeats all of his claims for relief. Can you help me understand, you know, looking at the complaint and the different grab bag of relief that he's requesting, how none of those survive? Sure. So with respect to permanent injunctive relief, I think that the analysis is just the same as preliminary injunctive relief. He wants to carry in these parks and playgrounds and the overlapping laws prevent him from doing so. With respect to damages, I think this is an instance where causation is sort of the flip side of regressibility. His injury is not being caused by the public health order when it's completely when he is completely prevented from doing the thing that he wants to do. And I would point the court to Judge Ide's opinion in Valdez, the second Valdez opinion, which did dismiss all the claims for relief that the plaintiff in that case sought because of overlapping obligations that prevented them from engaging in the conduct that they wish to engage in. I'll reserve the rest of my time for rebuttal. Thank you very much. Mr. Judge. May it please the court. Opposing counsel. I'm Blair Dunn and I'm here on behalf of Mr. James Springer, the appellee cross appellant in this matter. I'm joined at council table by Mr. Zach Cook. And I'd like to begin by first addressing some points of clarification. And the first one I'll address is, of course, the court's questions over the We the Patriots case and the supplemental briefing we did on that case. I think it is important to clarify that Judge Hart's you just asked about the rest of the statements that Sheriff John Allen, the Bernalillo County Sheriff, made. And he did say, excuse me, essentially that it was not going to be enforced at all. And his reasoning was, as the court acknowledged, that there was no common sense to it and it would do nothing to further the goals of public safety. And that does apply to the Bernalillo County ordinance. There's cross jurisdiction as well in Albuquerque between Bernalillo County sheriffs and they do respond to things within the city. So there is that as well. So his office, at least, wasn't going to enforce any of these orders is what the very clear statement was. And that had been a statement from before. Chief Medina, when the first public health order before the Urias decision came out, said that the city of Albuquerque wasn't going to enforce it at all either. After Judge Urias' decision, there was the amendment that we're here today about. And then he made the statement that we've included in our supplemental brief that he was not going to enforce it himself. They would just report it to the state police. So you have another statement of non-enforceability by the chief of police at that point or that he won't be enforcing it. Maybe not non-enforceability. Council, why does that matter? Why does any of this matter at all? In the supplemental brief that you submitted, I mean, I read it to say essentially We the Patriots was wrongly decided. Its analysis was, I think in your words, quote, too shallow. And then you presented these two articles. But we are to presume that the state local ordinances are lawful and constitutional. We're also to presume that people are going to follow them. So why does it matter what the sheriff tells the local media? I understand. And I think we acknowledged in our brief, supplemental brief, that this court must acknowledge their presumptive constitutionality. As the court may notice, I have the case in the state district court that's addressing the Albuquerque instruction. And that is state pending a decision here. But the important point is that while this court may presume that constitutionality for purposes of Mr. Springer's declaration, he does not. In fact, he relied on those statements of public officials. And he relied on the fact that there is no enforcement of that or there was no enforcement of that that we could find or that he knew of prior to his declaration. Does he say that he would violate those ordinances, even if they haven't been found to be unlawful? I saw that as a fatal gap in his standing argument. I don't think that's what he said. I think that that's. But doesn't he have to say that I would violate a law that is presumed to be constitutional before he has standing? And that's irrespective of whether some law enforcement officer would enforce it. And I apologize. What I was saying is I think that's exactly what his declaration says. Maybe not as clearly as it could. It says what? It says that he attended parks and playgrounds in Bernalillo County and it doesn't distinguish between the two. And that the only thing that prevented him from carrying while he was there, he was there, was the state's ordinance. He says nothing about those other ordinances. He was aware of those. He says I would have gone anyways and I had been going anyways armed, but I'm no longer going because only of this. He said he was aware of those ordinances? He doesn't say that, but he was. That's part of the why I say that the analysis is shallow. And when we get to this point of further factual development would probably help with this case. But here at the preliminary injunction stage, we've got enough to maintain the district court's preliminary injunction is my point. As this case goes on, his testimony would be, yes, he actually did carry on. And I know that's a profference. It's not really before the court, but he would. I don't think we. That's not the way we do business. It's got to be in the record or at the time that standing is challenged or we can't rely on it. And we can't rely on if it's not in the record. And it's not. I think you're agreeing with me, though. It's not in the record that he had ever knowingly violated the ordinances or that he would violate them. It's not explicitly in the record. It is inferred in the record, I think, from his statement. And let me give another example. So the the appellants here like to say that he's he didn't specify any specific park. And this gets to one of our other arguments about the playground stuff. And the court will note that Civic Plaza across from your office has a playground in it. So that's important to note for later. But specifically, he said he would go to specific Plaza, which is considered by the city of Albuquerque, one of its parks or recreation areas. And he would go there and organize a protest in support of his segment. Right. So we did identify specifically a park that he was prohibited from going to. And before that, he emphasized that he was going to parks armed and then no longer was able to carry them armed because he was worried about this particular order. There's it's inferred in there, though it's not explicit. He was already carrying in violation of those orders from for many years that those ordinances have been in effect. Apparently, a lot of people didn't know about it. I'm not sure why the governor issued this. Well, this executive order or had it issued if if she knew that it was already unlawful. So his ignorance would not be remarkable. Except it's not as ignorant. And I think that that's the issue is that the people that did know about it. Didn't pay it any mind because there's the New Mexico Constitution explicitly prohibits for local regulation of firearms. Our Constitution says they couldn't pass those ordinances. They're facially unconstitutional right there. And the court should look at the New Mexico Constitution and see, even though you're supposed to assume their lawfulness, you can't ignore the basic obvious point that a local regulation is prohibited by our state constitution. So you may end up having a very good lawsuit you can bring, but you've got to start again at this point in this case. Following the circuit precedent, which we have to do, I have to agree with that opinion, as you know. But given our precedent and the status of this case, you've got to start over. And you may have very interesting Second Amendment issues here, but I don't think we can address them. But I guess that's part of my issue is the start over part of this. Ultimately, that is something that this was presented to the district court. These administrative orders are part of the record. They were briefed in front of the district court. She got to consider these. So that issue is there. And their presumptive lawfulness aside, because they weren't presumptively lawful to the sheriff or to, for instance, Mr. Springer, I think that we should be able to at least go back and complete that record and have the court look at that analysis and deal with that. That's something that could be briefed below. And since we're here arguing whether or not the injunction was correct, the injunction, as this court, I think, noted, and certainly as the We the Patriots court noted, is moot, because the public health orders have been rescinded. So we're here on- We said it wasn't moot. Well, it's no longer in force. Yes. Okay. Okay. So it is not moot, because we need an answer on this for the next time it comes around. But it is, as far as Mr. Springer's concerned, no longer causing him injury. And I think it's important to note, his declaration doesn't talk about just planned injury in the future, right? Something in perspective. It actually talks about he was deprived. That's concrete and particularized. It says that he was. It may not specify which parks he was no longer able to carry in, but it does say that he went to the parks. So this idea of standing, I think we should be able to move past. Turning a little bit more to the merits, if we could, just briefly. As I noted, we have, of course, the Cross Appeal, and we're asking for the court to look at what the district court did with regard to playgrounds. And as the court can note, well, judicially, across from your office, there is a playground inside of a park. And there's this weird- and I'd like to give an example. So Mr. Springer goes to a park to watch his kids play on one side. It's classic sports, as he declares he would do. And then his younger child plays in the playground equipment. He goes armed because in Albuquerque he thinks that's prudent to defend himself and his children. And one of his younger child falls on the playground and scrapes their knee on the equipment or something. He's carrying his firearm the way that the ordinance reads, even though he's lawfully carrying it inside of the park, to step across the line, wherever that might be in a playground, maybe onto the wood chips, to go help his kid. He would now be acting unlawfully just to do that. It's a nonsensical distinction. And I think the Bonatti case, if I'm saying that right, actually, in Judge Timkovich's concurring opinion, which is relied heavily on in the Coons case, really explains that subcategory of property within a property, like a parking lot to a post office. You don't have that issue of the sensitive place inside of the post or outside of the post office in the parking lot that you do inside of the post office. And so to declare the sensitive place inside of the nonsensitive place, when they're really a sub-feature of each other, I think, causes problems. And that's why we were actually asking the court to address that in Judge Riggs's order. Which brings me more to the merits. I think it's important to note that in the third brief from the appellants, they talk about the Rahimi case and that Judge Riggs relied on a historical twin. At the appendix at 95, we may note this in our fourth brief, the district court specifically disclaimed against that she was deciding this on the basis of a historical twin. And relied instead upon just a historical analog. And we think that she reached the correct decision. And that, of course, gets to the argument back and forth about what is the correct historical analog and what that is. And again, I think that Judge Timkovich's concurring opinion and Bonadie actually, Bonadie, I don't know. I think that that actually gets to that point of explaining why in this circuit Judge Riggs is more, her decision is more in line with the precedent from this decision, from the Bonadie decision, which was prescient and still in line with Gruen, to not decide that every place that has children in it, which is essentially what the appellants are asking for, is a sensitive place that can be regulated without question. Counsel, can you help me with a vexing question regarding what has been referred to as the safe harbor, the presumptively lawful regulations that arises in Heller, and then is, of course, repeated in the Supreme Court's three follow-on decisions. And particularly after Gruen, figuring out where the presumptively lawful regulations fit within the Gruen framework. What's your view on, I'm assuming from what I just heard you say, that this would be analyzed under Gruen Step 2, because Mr. Springer gets through the first step. And so if we're at Gruen Step 2, how do we factor in the fact that the court has said that these types of sensitive places regulations are presumptively lawful into the Gruen framework? I think that's exactly the point that we have to get to. That's the larger issue in this case, is what is the correct historical analog in that second step. I think it's important to note that the district court, with the evidence in front of her, when she issued the injunction, and there was a bunch of later supplement of additional historical references and sites and explanations from articles and whatnot, at that point she was correct. And that's the point where she made the decision that you're at today. The later add-on of all these other arguments about the tallying, I'll call it, of the different parks and playgrounds in history, I think is too little too late. But more importantly, I think it's still incorrect. And to answer your question, I think that the correct place to look is before ratification and immediately after ratification. I'm not saying you don't give weight, like they say we do, but you don't give weight to that Reconstruction era stuff. But let's look at when that Reconstruction era type of information that they've supplied the court really comes in. You're talking about stuff that's perhaps two decades after Reconstruction versus stuff that's right before the ratification of the Second Amendment and right after. And I think that the court should consider all of it. But the district court, I think, got it right in her analysis that focusing on that area first is where she should look. If there was no answer, and I think there was an answer in the framers' time, then you look back to that later time for some sort of example of where the country is. But at the time of the ratification, that's where I think you look. But in terms of the weight of the evidence that New Mexico would have to bring forward, does the fact that the Supreme Court has declared these types of regulations presumptively lawful lessen their burden in any way? I don't think so. I think that BRUIN still stands for what it stands for, and the court should strive to get as close to what BRUIN says. I don't know that there's, even the Rahimi case, I don't know, really lessens that burden for the state. I think it remains what it was at the end of BRUIN. Yeah, I guess, you know, we're of course trying to faithfully apply all of what the Supreme Court opinions say and trying to figure out the presumptively lawful regulations and how they fit into the BRUIN two-step framework is a challenge. And so I appreciate your guidance on that. That is the question of the day. And of course, BRUIN comes after Heller, and we have Heller, and I don't know, maybe this means that we also need some further clarification from the Supreme Court about what the BRUIN test actually says. I think that the litigation around the country and from the different circuits the court can see is not in line or completely in line with each other. And for that reason, I don't know that this court should follow along behind some of the Antioch cases or some of the others that have been decided. I think that there's enough of a distinction here. I think there's a distinction between Mr. Springer's declaration and his decision to carry and, for instance, the We the Patriots declarants. I think there is a distinction between the two, and this court should evaluate that. But that's all my time, and I appreciate it. Thank you. Ms. Carter, do you wish to? I'm going to limit you to five minutes, but I'm not sure you'd want to spend all that time. Okay, thank you. I'd like to speak first to the issue of Mr. Springer's declaration. It's extremely short. I don't think there is anything in there to support the suggestions that we heard here today that Mr. Springer was aware of and intended to violate these separate laws. And to the contrary, in We the Springer, what this court said was that Mr. Smith and Mr. Springer and Mr. Dodd, the plaintiffs there, would presumably obey the city and county laws and cited O'Shea v. Littleton for the proposition that courts generally assume that parties will obey laws. With respect to Civic Plaza, he did say that he was planning to, and I'm going to quote here, organize and attend a rally in support of the Second Amendment to exercise my First Amendment rights by engaging in the expressive conduct of openly carrying a firearm in Civic Plaza but have been prohibited from doing so by the public health order. So he didn't say anything about going to the playground in Civic Plaza. To the contrary, he said that he wanted to organize and attend a rally there. The public health order did not prohibit him from doing that. It is not a park. He couldn't go into the playground because of the public health order, but he didn't say he wanted to do that. He said he wanted to organize and attend a rally. The administrative instruction made clear that Albuquerque was interpreting state law to prohibit that, a different state law, not the public health order. So Civic Plaza is completely irrelevant, and it remains the case that he has identified no place where he wants to carry a firearm that is covered by the public health order. With respect to the remand question, it seems from the arguments today that he wants another bite at the apple, but I think if this court looks at the Utah versus Babbitt decision, that was one that was here on an appeal from a grant of a preliminary injunction. The court determined that there wasn't standing, and it dismissed seven out of the ‑‑ it dismissed all of the claims, seven out of the eight claims as to which that standing was absent. So the fact that the court ‑‑ that this case is here on a preliminary injunction is no barrier to that being the disposition. Now, my friend spoke a lot about Bonnady. First point is that he relies on Judge Timkovich's partial concurrence, partial dissent, not on the majority opinion, and that's particularly important because the majority in Bonnady said that that language from the Supreme Court's Heller opinion, that prohibitions on guns in sensitive places like schools and government buildings was conclusive as to a prohibition on guns in government buildings. That was a case about carrying guns in a post office. And Judge Timkovich's opinion, footnote seven of his concurring and dissenting opinion says, I part ways with the majority on this point. I think it's just a presumption. They think it's conclusive. And I don't think there's any way to distinguish the government buildings part of Heller's sentence from the schools part. We obviously rely on the fact that parks and playgrounds are analogous to schools. The constitutionality of prohibitions in schools is clearly established not only in the Supreme Court's jurisprudence, but also in a way that binds this court in Bonnady. Remind me, didn't Bonnady predate Bruin? It did predate Bruin, but that part of its analysis rested solely on that language from Heller, which the Supreme Court then reiterated. First it repeated it at McDonald, then it repeated it in Bruin, and then of course Justice Kavanaugh set it out verbatim in an opinion joined by the Chief Justice. Yeah, sure. But isn't a fair reading of Bruin to say that it was looking at how the law was developing after Heller and saying, well, you and the lower courts are getting this wrong, and when we say two steps, we mean two steps, and here's the analysis you have to apply. In other words, what we're talking about is the challenge of whether there's a shortcut, so to speak, with the presumptively lawful regulations and how now that fits in the Bruin two-step framework. The Bonnady opinion was very clear that it was not using the two-step that now disfavored two-step analysis to approve the prohibition in government buildings. It was doing that solely on the basis of that controlling language from Heller. So I agree with you, opinions, other opinions that relied on the two-step means and scrutiny, those are no longer good law, but that is not the case with Bonnady. And, of course, in the circuit, later cases have to clearly and pellucidly overrule prior precedent in order for them no longer to be binding. So that's why this court has continued to look to pre-Bruin decisions with respect to, for example, the felony prohibitor. My friend said that there were decisions- It started at 5.55, she didn't drop it to 5, but I was just going to give you what you requested for rebuttal. Okay, well, thank you for the court's time. Thank you, counsel. Case is submitted. Counsel are excused. Thank you.